[Cite as *State v. Glover*, 2016-Ohio-2749.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26523 |
| | : | |
| v. | : | T.C. NO. 14CR1033 |
| | : | |
| MARVIN M. GLOVER | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___29th___ day of _____April_____, 2016.

. . . . . . . . . . .

CARLEY J. INGRAM, Atty, Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 N. Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Marvin Glover,

filed December 18, 2014. Glover appeals from his December 19, 2014 Judgment Entry

of Conviction, following a bench trial, on two counts of rape, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and one count of sexual battery, in violation of R.C. 2907.03(A)(5), a felony of the third degree. Prior to trial, Glover pled no contest to three additional counts of sexual battery. He was sentenced to 10 years to life on the rape convictions, and to 48 months on the sexual battery convictions, all to be served concurrently, and he was designated a Tier III sex offender.[1] The victim herein is T.H., the daughter of Glover's live-in girlfriend, J.D. We hereby affirm the judgment of the trial court.

{¶ 2} Glover was indicted on March 27, 2014. On April 15, 2014, he filed a "Motion to Suppress Statements," which the trial court overruled after a hearing. On October 17, 2014, Glover filed a Notice of Alibi, asserting in part that "he was employed in 2 jobs working many hours away from the home." On October 20, 2014, the "State's Motion of Intent to Use Similar Acts Evidence" was filed. Trial commenced on November 3, 2014.

## I. Trial testimony

## A. Leroy Sanders

{¶ 3} Leroy Sanders testified that he is employed by the City of Kettering Police Department as a support services sergeant, and that he supervises the dispatch center, the communications center and the property room. Sanders stated that in response to a request from Detective Schomburg, he downloaded a 911 call that the dispatch center received at 5:30 a.m. on the morning of March 18, 2014, from a female caller. When the State sought permission to play the recording of the call, defense counsel objected, citing

---

[1] Glover's judgment entry of conviction erroneously provides that he was found guilty of two counts of rape by a jury, and that he pled no contest to four counts of sexual battery.

"the relevance of the 911. It has no relevance to Count I or II or even to the other count * * *." The court overruled Glover's objection, and the State played the recording of the call. The following exchange occurred:

Q. Did you hear the emotion in her voice?

A. Yes. I heard it.

Q. Did it sound like she was still under * * * the excitement of the event that occurred previously to you?

A. In my opinion, yes.

Q. And as far as when you heard the question in relation to how long since this had been going on, what was her response?

A. Since she was seven.

Q. And that would have been shortly after this very incident occurred that day she was already stating that.

A. Yeah. Correct sir.

On cross-examination, Sanders indicated that he merely provided the recording of the 911 call and that he has never spoken to the female caller and is not familiar with her normal emotional state.

### B. Amy Dallaire

{¶ 4} Amy Dallaire testified that she has been employed by the Miami Valley Regional Crime Laboratory for 12 years as a forensic scientist "in the serology DNA section." The court designated Dallaire as an expert in serology and DNA analysis on the State's motion. Defense counsel objected to her testimony, asserting that "the sole purpose of this witness is simply to come in and to testify that on March 18th, 2014, [the]

incident which we've already pled to, that there was DNA found from my client." According to defense counsel, the testimony was irrelevant to the offenses before the court. The State asserted, in part, that "this testimony goes to show that everything that [T.H.] has said and reported in relation to this case that we can confirm has been confirmed; whereby the things that Mr. Glover has said have not.* * *." The court overruled the objection, noting that if "in fact this is a question of credibility, then it would seem to me that the testimony of this witness would be probative of the credibility of [T.H.]"

{¶ 5} Dallaire testified that she received a sexual assault kit from T.H. and a DNA standard from Glover, and that her analysis indicated the presence of Glover's DNA to a reasonable degree of scientific certainty in a dried stain from T.H.'s right breast and a swabbing from her underwear. On cross-examination, Dallaire testified that she did not perform serology testing to determine if the DNA she found was from Glover's semen. She stated that she was unaware that Glover was a father figure in T.H.'s household with access to her clothing, and she acknowledged that his DNA could have come from sources other than semen. Dallaire stated that she cannot provide a timeframe for when the DNA was deposited by Glover. On redirect examination, Dallaire testified that she did not test for the presence of semen because the kit she received indicated that Glover had licked T.H.'s right breast and performed oral sex on her, and there was no allegation of ejaculation.

### C. Jeff Geckler

{¶ 6} Jeff Geckler testified that he has been employed by the City of Kettering as a police officer for 28 years. He stated that on March 18, 2014 , while on routine patrol, he

and another officer were dispatched to an apartment building located on Bromley Place at 5:30 a.m. Geckler stated that he was the first to arrive at the scene, and that he encountered T.H. in the lobby of the building. According to Geckler, T.H. "was upset. She was having a little trouble speaking. She's more or less holding back trying to cry. Her eyes were kind of swelled up with tears." Geckler testified that T.H. "stated that her mother's boyfriend had molested her." Geckler stated that T.H. indicated that Glover was "in her mother's bedroom," that he asked T.H. to go get J.D. and bring her to him, and that T.H. did so. He stated that J.D. was emotional and yelling upon learning what T.H. had alleged that Glover had done.

{¶ 7} Geckler stated that he requested additional support, and that T.H. and J.D. were transported to Kettering Hospital by Officer Jung. Geckler testified that he and additional officers entered T.H.'s second floor apartment in search of Glover, and that there "was an uncle who was sleeping on an air mattress in the living room. There were two brothers in one bedroom and another, [T.H.'s] sister, in the bedroom where [T.H.] had been claiming the incident occurred." Geckler stated that the uncle, J.D.2, is J.D.'s brother. Geckler stated that Glover was not in the apartment, and that he found Glover's cell phone and car keys there.

### D. T.H.

{¶ 8} T.H. testified that she is 18 years old, that she was born in 1996, and that she is a senior at a local high school. She stated that she initially resided on Iddings Court in Dayton with J.D. and T.H.'s two brothers who are 13 and 14 years old, and that Glover moved into their home a few months after he began a relationship with J.D., when T.H. was "six or seven." She stated that she also has a six year old sister, and that Glover is

the girl's father. T.H. testified that from Iddings Court, her family moved to "Rugby," and then to Tabor Avenue. She stated that she was "around thirteen" when they moved to Tabor Avenue and in middle school. T.H. testified that she currently resides on Bromley Place in an apartment.

{¶ 9} T.H. stated that in their home on Iddings Court, there were three bedrooms, and that her brothers shared a room and she had her own bedroom. T.H. stated that a few months after Glover moved into their home, he began entering her bedroom at night. The following exchange occurred:

Q. Do you remember the first time that he ever did that?

A. Yes.

Q. And as far as on that first time that he ever did that, were you asleep at the time he came into the bedroom?

A. Yes.

Q. What was it that you remember waking you up that night?

A. Him coming in and setting his drink down on my dresser.

Q. * * * Would you usually sleep and your door would be shut or would it remain open?

A. Shut.

Q. * * * So you think he may have opened the door then?

A. Yeah.

Q. * * * So you saw him walk into the bedroom?

A. Yes.

Q. Do you remember what he was wearing when he walked into the

bedroom?

A. Just his underwear.

Q. * * * And do you remember what kind of underwear it was? Was it boxer shorts or what was it?

A. Boxer shorts.

Q. * * * You said he set his drink down on your dresser. As far as the drink, was it in a bottle? Was it in a glass?

A. It was in a glass.

* * *

Q. * * * And when he set the glass down on the dresser, what did he do at that point in time?

A. He got on top of my bed and he told me don't tell anyone, this is our little secret.

* * *

Q. Are you laying on the bed at that point in time or how are you situated?

A. Laying on the bed.

{¶ 10} T.H. testified that she could smell alcohol on Glover's breath, and that she was scared. She stated that Glover pulled her pajama pants down and removed them, along with her underwear. According to T.H., Glover put "his tongue in my vaginal area," and that she did not know what to do. She stated that Glover then put her pajamas back on and left the room. The following exchange occurred:

Q. Did it continue to happen after that first time?

A. Yes.

Q. Was there a certain pattern to it? Was it usually at a certain time of day that it would happen?

A. Nighttime.

Q. * * * And as far as was there a pattern as far as the usual type of thing that he would do to you when he did this?

A. Yes.

MR. GABEL: Your Honor, at this time, I would object.

THE COURT: * * * The objection will be overruled.

* * *

MR. GABEL: Your Honor - -

* * *

MR. GABEL: - - we'd at least ask for some time period. Are we talking about within a month of this first one? A year? Two years? Ten years? What? Can we at least get a date or a time period?

MR. SCHOEN: I think the question was establishing a pattern. I mean I can get to the point when we establish how long the pattern was ongoing. But right now, I'm trying to establish what the pattern usually was.

THE COURT: Well, I think you can establish the pattern then you can establish the frequency.

* * *

By Mr. Schoen:

Q. I'll remind you of the question again. Was there a certain thing that he would typically do as far as you indicated on the first time that he had put his tongue on your vagina? Was there a typical thing? Was that the common thing that he would do or would he do other things on different occasions?

A. That was the common thing but he tried other stuff.

{¶ 11} T.H. stated that Glover resided with her family at each of the addresses she indicated above. The following exchange occurred:

Q. How (sic) we talked about how he'd usually come in at night and he'd usually being these things. (sic) Mr. Gabel had asked well what time frame are we talking about. You indicated Marvin had been the man of the house for 11 years. Did the abuse occur over the course of the entirety of that 11 years?

A. Yes.

Q. * * * Now, you indicated that he usually would come in in the middle of the night. Would you usually stay in your bedroom when these things would happen?

A. Usually.

Q. * * * Was there an incident on Iddings Court where he actually removed you from your bedroom?

A. Yes.

Q. Now, how old do you remember being at the time when he actually removed you from your bedroom?

A. The same age, six or seven.

Q. * * * So this would've been at Iddings Court also?

A. Yes.

Q. And on this specific incident, is it day or nighttime when it happens?

A. It's around like 7 or 8, like.

Q. So it's the very early-morning hours?

A. Yeah.

Q. * * * And what do you remember happening as far as how does Marvin * * * come and get you that day?

A. He came into my room and picked me up out of my bed and took me downstairs to the living room.

Q. * * * Had you been asleep when he came into your room?

A. Yes.

Q. Do you remember what he was wearing on this occasion?

A. The same thing. His boxer shorts.

* * *

Q. And when he takes you down to that living room, what is it that he does once you get to the living room?

A. He lays me down and pulls down my pajama bottoms and puts his tongue in my vaginal area.

Q. * * * And when you say he lays you down, did he lay you on the couch or where did he lay you?

A. On the floor next to the couch.

\* \* \*

Q. \* \* \* Had it happened, you know, between that first time and this time or is this the second time that it ever happened?

A. It happened in between.

T.H. stated that the incident ended when Glover "left and I went back upstairs to my room."

{¶ 12} The following exchange occurred:

Q. \* \* \* Now, you indicated that \* \* \* you moved to these different places and this continued as you moved to all these different locations. I want to talk to you about an incident that would've occurred \* \* \* in December of 2013. You had said that usually he would \* \* \* just perform oral sex on you but sometimes he's tried other things. In December of 2013, is that an incident where he tried other things?

A. Yes.

Q. \* \* \* And as far as where this incident was occurring, where were you located at the time of this incident?

A. In my room.

Q. \* \* \* And what apartment would you have been in as far as the apartments that we talked about?

A. Bromley.

\* \* \*

Q. Was it daytime or nighttime?

A. Nighttime

Q. And how does Marvin enter this time?

A. I don't remember.

Q. * * * You were asleep at the time he entered?

A. Yes.

Q. * * * And as far as, you know, what is it that was different about this time that sticks out in your mind?

A. He put his fingers inside of me.

Q. * * * Is that the only thing he did to you on that particular occasion?

A. And his tongue.

Q. * * * And when you said he put his fingers inside of you, are you talking about on your vaginal area?

A. Yes.

Q. * * *And how did it feel as far as when he put his fingers inside of you?

A. It hurt.

Q. * * *And when you say it hurt, was it a sharp pain?

A. Yes.

Q. What did you do when he did that and there was that sharp pain?

A. I pushed him off of me.

Q. How did he react when you pushed him off of you?

A.  He said sorry and that he wouldn't do it again and he left.

\* \* \*

Q.  How old were you at that point in time?

A. \* \* \* Seventeen.

\* \* \*

Q.  As it was going on throughout the years, did you develop ways that you would cope with what was happening to you?

A.  I just acted like it wasn't happening until I got older.

{¶ 13}  T.H. testified that as she got older, she "got more depressed."  T.H. stated that she did not feel comfortable talking to J.D. about what was happening to her "[b]ecause [J.D.] was with [Glover] and I didn't want to make her mad."  She stated that she loves her sister and Glover is "my sister's dad and my mom loved him and everyone thought he was a good person."

{¶ 14} T.H. stated that S.K. is her best friend, and that she met S.K. in eighth grade.  T.H. stated that she told S.K. their freshman year that she had been abused in the past, but she did not "tell her anything specific and I didn't tell her that it was ongoing."  When asked what made her decide to disclose the abuse to S.K., T.H. replied, "I just kept getting sadder and sadder."  T.H. identified State's Exhibit 2, a letter that she addressed to "[m]y mom and dad" but did not deliver to her parents. She stated that she wrote the letter in October of 2013, and that she described therein various incidents of Glover's abuse and her feelings of confusion and depression.  She testified that due to her depression, when she was 17 years old, she "started cutting and tried to commit suicide" by taking "a bunch of pills that I had."

{¶ 15} When asked about the incident that occurred on March 18, 2014, defense counsel objected and the court noted that the "objection is to the fact that he's pled no contest to that and it's, in a sense, redundant." The court then indicated that it was still "of the view that it's probative of the charges still at issue and I would overrule the objection." Counsel for Glover requested a continuing objection "dealing with the 18th of March, 2014."

{¶ 16} T.H. testified that on that date Glover entered her bedroom around 5:00 a.m., and that he "started touching my butt, and then he flipped me over, so that I was laying on my back, and he put his tongue in my vaginal area." According to T.H., Glover then "pulled my sports bra down and put his mouth on my chest as he rubbed himself in my vaginal area." T.H. stated that Glover was wearing boxer shorts and that her pants were on at the time. T.H. testified that her sister was asleep in the room in the course of this incident.

{¶ 17} After Glover returned to his bedroom, T.H. testified that she looked at her phone and it was 5:11 a.m. T.H. stated that she "laid in bed, and then I checked Facebook to see if there was anyone I could talk to, but there wasn't, so I waited a little and then I called 911." T.H. stated that she met the police downstairs at the front door to the apartment building when they arrived and told them what had happened that morning. She stated that she then went back into the apartment and told J.D. what had happened before going to the hospital.

{¶ 18} T.H. stated that Detective Schomburg arrived at the hospital, and that she related to him a version of events consistent with her trial testimony regarding Glover's conduct. T.H. stated that she met with a sexual assault nurse and was examined. T.H.

stated that she told the nurse which parts of her body had been touched by Glover. She stated that she did not shower or change her clothes before going to the hospital, and that the police collected her clothing.

{¶ 19} On cross-examination, T.H. testified that she typed State's Exhibit 2 on her cell phone. T.H. stated that the letter is dated October 24, 2013. According to T.H., she sent the letter to S.K. and no one else.

{¶ 20} The following exchange occurred:

Q. Let me ask you, [T.H.], there was some discussion between Marvin and your mother about moving away from Kettering to either possibly Beaver Creek (sic) or perhaps even Columbus, Ohio, correct?

A. I don't know about Columbus, but Beaver Creek (sic), yes.

Q. * * * And your reaction to that, I understand you were unhappy. Is that a fair statement?

A. Yes.

Q. You didn't want to move, did you?

A. No.

Q. And you didn't want to move because, in fairness you're a senior, and you don't want to leave your friends, right?

A. Yes.

Q. Particularly [S.K.]?

A. And others.

* * *

Q. * * * Who's [S * * * * y]?

A. My friend.

Q. A friend. [S * * * * y] the young lady who came over and spent the night - - was supposed to spend the night at your place, and you and she didn't tell mom and dad - - Marvin, the truth. You remember what I'm talking about?

A. Yes, but I didn't know that she was supposed to spend the night at my house.

Q. * * * But you got in trouble with mom over that, didn't you?

A. Yes.

Q. She felt you had lied to her; is that correct?

A. Yes.

Q. You were pretty upset?

A. Yeah.

Q. * * * And you were upset with Marvin too because he supported your mother's actions. Is that a fair statement?

A. I don't remember his ever discussing it with me or my mom.

{¶ 21} T.H. testified that she did not seek medical treatment after she began cutting herself or after she attempted suicide, and she indicated that the scars from cutting were no longer visible because she cut herself a year or two ago.

{¶ 22} T.H. stated that J.D. suffers from schizophrenia and takes medication. T.H. stated that "life is not pleasant" when J.D. fails to take her medication. T.H. testified that she never told her brothers about Glover's abuse, and that they never witnessed it. T.H. stated that she always wears underwear to bed. She stated that she did not

remember if Glover removed her pants and underwear when he carried her downstairs on Iddings Court. She stated that she is unable to provide the exact date or day of the week that the December, 2013 incident occurred. According to T.H., when she was younger, Glover would occasionally leave "a few dollars" on her dresser after he assaulted her, but that he did not do so on every occasion.

{¶ 23} Defense counsel provided Exhibit 2 to T.H., which he characterized as "well written," noting that in "looking throughout the entire thing I don't see one spelling error." He further noted that "[e]ven the punctuations are good," and he asked T.H. repeatedly if someone else helped her write the letter. In reading portions of Exhibit 2, defense counsel questioned T.H. about inconsistencies in the letter and her direct testimony. For example, defense counsel confirmed with T.H. that the exhibit provides that in the course of the first incident, Glover reached his hand up inside her pajama dress, and that she remembers the incident clearly, yet she testified that she was wearing pajama pants at the time. Also, T.H. acknowledged that the letter provides that Glover left money on her dresser every night that he abused her, in contrast to her direct testimony that he did so only occasionally.

### E. S.K.

{¶ 24} S.K. testified that she is a senior in high school and that T.H. is her best friend. S.K. testified that T.H. disclosed to her that she had been sexually abused, but S.K. was not "aware that it was current and ongoing until * * * the summer before my junior year and the beginning of my junior year." S.K. stated that T.H. sent her a message on Facebook that she planned to give to J.D., and that after reading the message, she became aware of the fact that the abuse was ongoing. She testified that she asked T.H.

if Glover was the perpetrator of the abuse, and that T.H. responded affirmatively. S.K. identified Exhibit 2 as the message she received from T.H., and she indicated that the message was sent on October 24, 2013 at 10:17 p.m.

{¶ 25} S.K. testified that "during our junior year, [T.H.] started to become more depressed. She would stay home a lot and stay in bed. She cut herself. I saw scars and she showed the knife that she was hiding in her closet. And she also disclosed to me that she attempted suicide by taking pills." S.K. indicated that the scars she observed were on T.H.'s wrists. She stated that T.H. did not seek medical treatment and that T.H. "was putting some medicine on it at home, but not going to the doctor." S.K. testified that she advised T.H. to either tell her mother about the abuse or go to the police.

{¶ 26} On cross-examination, S.K. stated that she met with Detective Schomburg and provided a statement in which she indicated that she never witnessed any inappropriate actions towards T.H. by Glover. She testified that Glover never said anything in her presence that made her uncomfortable. S.K. stated that she has spent the night numerous times at T.H.'s home, and that she did not observe inappropriate behavior between Glover and T.H. S.K. stated that she has no personal knowledge of the abuse alleged by T.H. S.K. stated that she did not report the abuse T.H. disclosed to her to the police or her parents because T.H. "had expressed fears to me that getting police involved could tear apart her family, and she was also afraid of just what would happen if people knew." S.K. indicated that Glover worked a lot and came home late at night. On redirect examination, when asked about T.H.'s concerns about disclosing the abuse, S.K. stated that T.H. "was concerned that potentially her family could be ripped apart." She stated that T.H. "cares a lot about her family and she's a very selfless person

and she hates to burden others, and she was afraid that that's would happen." (sic). When asked about the nature of T.H.'s relationship with J.D., S.K. responded, "as of now it's pretty awful."

### F. Michelle Ping

{¶ 27} Michelle Ping testified that she has been a nurse for 24 years and that she has worked in part as a registered SANE nurse (Sexual Assault Nurse Examiner) since 2006 for Butler County. Ping stated that the SANE program developed in response to overcrowding in emergency rooms such that "it took a long time for a nurse and a physician to properly do the examination for sexual assault. So the program started popping up, that it designates a nurse to be trained to collect evidence, follow a chain of command, and testify in court."

{¶ 28} When the prosecutor moved the court to designate Ping as an expert witness, the following exchange occurred:

> MR. GABEL: * * * I have no objections to her being an expert as - - she's a nurse, so certainly no objection. However, I do object and I'm going to continue my objection in regards to the testimony itself.
>
> My understanding, based on the discovery I've been given, her testimony is simply the examination of March 18th 2014. It was not relevance (sic) to those issues before the Court in my opinion, or * * * even if she found whatever she found and it's confirmed, it doesn't go to those three * * * counts, which are before this Court.
>
> So I really don't think it's necessary and I would ask the Court to dismiss this witness.

THE COURT: * * * yeah, we've had similar objections to other witnesses in this case, and I'll overrule the objection.

MR. SCHOEN: And just of note, Your Honor, Mr. Gabel has put chain of custody directly at issue in this case, and as far as how this evidence was - -

THE COURT: Well, that is true.

MR. SCHOEN:   - - collected - -

* * *

MR. SCHOEN:   - - we need her as a witness.

THE COURT:   That is true.   But I did say this morning that the fact that * * * there'd been a plea on the March 18th incident, didn't take those facts off of the table for purposes of this trial, so - -   the objection's overruled and then, of course, there is the chain of custody issue, which I had not thought about.

{¶ 29}  Ping testified that on the morning of March 18, 2014, she was called to the Kettering Hospital Emergency Department, and that when she arrived, between 5:00 and 6:00 a.m., "there was already a police officer at the bedside, so I could not go in and perform the exam right away." Ping stated that after the officer left T.H.'s room, she was able to perform the exam. She stated that T.H. was 17 years old at the time, and that she was wearing "sleep clothing."   Ping stated that she explained to T.H. the nature of the examination.   She stated that she obtained a statement from T.H. in order to determine the direction of the examination.   Ping read the following statement from T.H. verbatim: " 'He came in and started touching my butt.   He pulled my legs apart and put his tongue

in my vagina. After that he pulled my shirt down and put his mouth on my right breast. He started rubbing himself, his private area on me, on my vagina, but my underwear was on. * * * I then called 911 and this has been happening to me since I was 7.' " Ping stated that T.H. maintained eye contact and kept her arms folded as if hugging herself in the course of the exam.

{¶ 30} Ping stated, "* * * when I took that statement, I still do the exam according to protocol, however, with the mention of the right breast I do swabs of that area, wherever they would mention that the mouth was, to see if there's DNA." Ping stated that she did not note any injuries on T.H.'s person in the course of the exam. She stated that T.H. declined a vaginal exam because "there was no vaginal penetration." Ping identified the sexual assault kit from T.H.'s exam and its contents, including a bag containing T.H.'s clothing that Ping collected. She testified that she delivered the completed kit to Detective Gary Schomburg. Ping stated that T.H. indicated that she did not shower or change her clothes prior to coming to the hospital. In response to questions from defense counsel regarding whether or not she could substantiate T.H.'s allegation that she has been abused since the age of seven, Ping responded that "[t]here were no injuries."

### G. Vincent Mason

{¶ 31} Vincent Mason testified that he is a detective with the City of Kettering Police Department. He stated that on March 18, 2014, he received T.H.'s 911 call. He stated that T.H. was "very emotional, very distraught sounding to me. At the beginning it was hard to get answers out of her because she was * * * having trouble breathing * * * having trouble getting the words out." Mason stated that T.H. indicated that the abuse she was reporting "had just happened." Mason stated that in January he "took over

transporting all evidence from our property room to the crime lab, checking it in down there, and then transporting it back to * * * our property room, and checking it in."   Mason stated that he transported T.H.'s exam kit, which he identified, from the property room to the crime lab on April 1, 2014 and returned it to the property room on April 15, 2014.   He stated that he also transported Glover's DNA swabs, which he identified, on the same dates.

### H.   Gary Schomburg

{¶ 32} Gary Schomburg testified that he has been a detective with the City of Kettering Police Department for six and a half years, having been employed by the City for 14 years.   He stated that he responded to Kettering Hospital at 6:00 a.m. on March 18, 2014, in response to T.H.'s allegations.   After receiving an account of the allegations from Nurse Melissa Grant at the hospital, Schomburg stated that he spoke to J.D. According to Schomburg, J.D. was in a separate room because she "was hysterical, crying."

{¶ 33} Schomburg stated that he then spoke to T.H. in an evaluation room, and that T.H. was "very calm" and able to provide an account of what had happened to her. He stated that he is trained to interview victims of sexual abuse, and that he followed the appropriate procedures in interviewing T.H.   He stated that T.H.'s account of the abuse "started off with the March 18th, and then she disclosed other abuse."   The following exchange occurred:

> Q.   Now, the other abuse, without going into specifics of her
>
> disclosures, you've talked to her numerous times throughout this case?
>
> A.   Yes.

Q.   Has her story remained consistent from the first day, when the March 18th incident occurred to present time?

A.   Yes, sir.

{¶ 34} Schomburg stated that he retrieved the sealed sexual assault kit and the bag of T.H.'s clothing, which he identified, from Michelle Ping.   Schomburg stated that he booked the items into the Kettering Police Department property room.   Schomburg stated that he subsequently proceeded to Bromley Place, where he spoke to J.D., her brother, and T.H.'s sister.   Schomburg stated that he also spoke to S.K., because T.H. advised him at the hospital that she had disclosed the abuse to her. The following exchange occurred:

Q.   Are you aware of whether [T.H.] would have had any ability to contact [S.K.] on the way from the apartment to the hospital?

A.   I don't believe so.

Q.   As far as when you spoke with [S.K.], was her story consistent with that of [T.H.]?

A.   Yes.

Schomburg testified that S.K. provided a written statement on March 19, 2014, and that it reflected what S.K. told him the day before.

{¶ 35} Schomburg stated that a friend of Glover's brought him to the police department on March 19, 2014.   Schomburg testified that the interview was recorded, and that he downloaded it to a disk which he later provided to the prosecutor's office.   He identified a transcript of the interview.   Schomburg testified that Glover advised him that he met J.D. in 2003 after he came to Dayton from Mansfield following the death of his

mother.    Schomburg stated that Glover never denied that he was in a parental relationship with T.H.    He testified that in the course of his interview of him, Glover indicated that T.H. is not sexually involved to his knowledge, and that having sex with her never crossed his mind.    Subsequently, Schomburg testified that Glover stated that he believed that T.H. " 'probably messed with girls.' "    When asked if T.H. had a history of lying, Schomburg stated that Glover replied, " 'I couldn't say.' "    The following exchange occurred:

> Q.   So when you confront him on the specific allegation she made, he's calling her basically a flat out liar?
>
> A.   Yes.
>
> Q.   And as to, you know, what I found interesting, I guess is what does he say about his tendencies of getting up in the middle of the night?
>
> A.   He said he gets up almost every night because he has insomnia.
>
> Q.   * * * And * * * when you spoke with [T.H.], when is she alleging that most of these instances take place?
>
> A.   I believe she said between 3:00 and 5:00 a.m.

{¶ 36} Schomburg testified that Glover told him that he jumped out a second floor window in the apartment when the police arrived on March 18, 2014, because he believed that they were there on an outstanding warrant.    Schomburg stated that after his initial denials, Glover admitted to abusing T.H. two or three times in the last year. He stated that Glover did not provide specific dates for the offenses.    Schomburg stated that he asked Glover if he wanted to write a letter of apology to T.H., and that Glover did so after Schomburg left the room.    Schomburg identified the letter, which provides in part, "I'm so

sorry for licking on your private part. * * * It just happened them three times. * * *."
Schomburg stated that at the end of the interview, Glover stated that he abused T.H. three times, twice in the last year and once at their home on Tabor Avenue. Schomburg testified that he obtained DNA samples, which he identified, from Glover, which were taken to the Miami Valley Crime Lab.

{¶ 37} The following exchange occurred:

Q. Has [T.H.] been inconsistent with you in her story as to what has been going on with her since she was the age of six or seven years old?

* * *

A. No.

Q. The people that [T.H.] has said she's disclosed these things to, did that check out?

A. Yes.

Q. Have those witnesses been inconsistent with you?

A. No.

{¶ 38} Prior to beginning his cross-examination, defense counsel addressed the court as follows: "I would ask that all testimony relating to DNA and relating to March 18th 2014, all the testimony by this detective, and any other witnesses, all be stricken from the record for purposes of appellate review, if necessary." The court indicated that "the objection is overruled." Schomburg indicated that after Glover admitted to three instances of abuse, he advised him that T.H. had been "coming on to him," and that he accepted responsibility for his conduct. Schomburg stated that Glover "denied that he ever did anything else, that he didn't rape her, and he denied the incident in regards to

putting his finger into her vaginal area back in December of 2013." Schomburg stated that his only evidence of the earlier three instances of abuse is T.H.'s statement. Schomburg stated that Glover does not have a felony record. He stated that in the course of the interview, Glover "was saying these are false allegations, and the only reason why * * * she was saying that [was] because they were going to move to Beavercreek." Schomburg stated that he told Glover "that the reason why she came forward is because she's having suicidal thoughts." Schomburg stated that he did not investigate whether the possibility of moving prompted T.H. to make allegations against Glover. Schomburg testified that he asked T.H. if she ever walked around the house in an open towel, and that she denied ever exposing herself to Glover.

{¶ 39} On redirect examination, Schomburg testified that in his experience, delays in disclosure in sexual abuse cases are "[v]ery common," and that as a result, there is often a lack of physical evidence of abuse. The following exchange occurred:

Q. So when the victim gives an interview on facts that can be corroborated, such as all the things that occurred on March 18, were all the statements she gave in relation to March 18th corroborated?

A. Yes, they were.

Q. By DNA evidence?

A. DNA evidence.

Q. By his own admissions?

A. His own admissions.

Q. When she said on March 18th, how she told her friend earlier, was that corroborated?

A.  Yes.

Q.  So the fact that the Defendant decides to victimize a young child where you can't get physical evidence, you build the case by corroborating when you can corroborate, correct?

MR. GABEL:  Objection to the form of the question, Your Honor.

THE COURT:  It is leading.  I'll sustain the objection.

BY MR.SCHOEN

Q. How do you - -

* * *

Q.  - - corroborate things in cases like these?

A.  Through the victim, through witnesses.

Q.  And who's been consistent in this case?

A.  [T.H.].

### I.  Brenda Joyce Miceli

{¶ 40}  Brenda Joyce Miceli testified that she is employed at Kline and Associates as a licensed psychologist, and that she has counseled "upwards of a thousand" victims of childhood sexual abuse. The court designated her an expert in the area of childhood sexual abuse.  Miceli stated that teenage victims "would be more likely to have suicidal behavior or cutting or substance use."  She stated that "most disclosures occur to a trusted adult. However teenagers in particular, are more likely to disclose to a peer than to an adult."  She stated that delayed disclosure is common, and "once an abuse has happened one time and a child hasn't told, they are less likely to tell as time passes." Miceli testified that most children, "when they make a disclosure, tend to make the

disclosure to someone they trust. It is usually done initially in a vague way where they will provide some information, this person touched me or they did something wrong. They don't generally give specific details. And if that person responds in a supportive way, they're more likely to give more information." Miceli stated, however, if "that person responds in a way that the child perceives as being negative or scary. Then they're less likely to give any additional information." She stated that for teenagers, "there can be, actually once kids hit puberty there can be more embarrassment that they have in talking about things. And oftentimes there's information that they may not share as readily because it's more embarrassing."

{¶ 41} Regarding abuse that is ongoing, Miceli stated that some "children compartmentalize and may continue to choose to have contact with the abuser because they put it off on the side and say it's not going to happen again." Miceli testified that "when you've had something that's happened multiple times, it can be difficult to remember specifics of any one event. If I ask you to tell me about every Christmas you've had for the last ten years, you're probably not going to be able to tell me details of every Christmas but you could give me a general idea of what usually happens." She stated that you also "might be able to remember the things that * * * were different." According to Miceli, "the same goes for children recalling sexual abuse that oftentimes the details of specific incidents may get lost unless there's something unique about that event." She stated that "[f]ar and away kids are abused by people that they know," and that it "is generally someone that the child trusts and who's in a position of authority to them and has access to them." She stated that the "research is clear that the closer the relationship between a child and their abuser, the less likely they are to disclose abuse."

Miceli stated that it is often difficult for children to disclose abuse because they worry "that people might not believe them or that they will be in trouble and so that will keep them from telling other people." She stated that "[i]nternalizing behaviors are behaviors that are turned more inward so there tends to be anxiety, nightmares, suicidal ideation, depressive symptoms, cutting," and that people around victims with internalizing behaviors "are not aware of that." On cross-examination, Miceli testified that she has not met T.H. She stated that many young children who are abused are not aware "that anything inappropriate has happened especially if it's someone that they trust."

### J.   J.D.

{¶ 42}  J.D. testified that she has a "good relationship" with Glover. She stated that she met Glover at the home of a friend of hers in 2003, and that he moved into her home in October of that year.   J.D. testified that she was not employed at the time, and that she receives Social Security income.  J.D. stated that she and Glover had a daughter together in 2008.  According to J.D., in 2003, T.H. was "a good child," and a "happy child."  She stated that T.H.'s demeanor did not change after Glover moved into their home.  When asked if T.H. interacted with Glover, J.D. stated that Glover "talked to [T.H.] and they jumped around, played and laughed, giggled, whatever."  She stated that her household acted as a family together, and that they would "go out to eat, go to parks." According to J.D., they also went to visit Glover's family in Mansfield, and that T.H. "was happy and she liked going. * * * She got along with the family."

{¶ 43}  J.D. stated that when T.H. was seven, she did not observe anything that concerned her regarding T.H.'s relationship with Glover. J.D. acknowledged being interviewed about T.H.'s allegations after March 18, 2014.   When asked if she had ever

seen anything that would lead her to believe that Glover did anything improper with T.H., J.D. responded, "Not at all." J.D. stated that she is a light sleeper, and that if "somebody moving around my house, * * * I can hear it. I mean I jump up, you know." J.D. stated that the steps in the apartment on Iddings Court are squeaky, and that she never observed or heard Glover carry T.H. down the steps.

{¶ 44} J.D. stated that in December, 2013, she, Glover, T.H. and the three other children resided on Bromley. She stated that during that time, T.H. invited S.K. and other girls to the home to spend the night. According to J.D., Glover "stayed in our room when [T.H.] would have company or he would be at work." J.D. stated that on occasion she would have to tell T.H. to put on more clothes in the home. According to J.D., "it would be, you know, men in the house and his friends would be there and, you know, like [T.H.], go cover up, you cannot be around these mens (sic) like this."

{¶ 45} J.D. stated that T.H. was a good student and that her grades were good and that she participated in the school choir. She stated that T.H. "liked to go out with her friends." J.D. testified that she was unaware of T.H. ever cutting herself or taking pills in an attempt to commit suicide. J.D. testified that she has been diagnosed with schizophrenia, for which she takes medication. She stated that her medication would not cause her to be unaware of what went on in her apartment. J.D. stated that T.H. has not been diagnosed with depression. She stated that she has taken T.H. to Children's Medical Center for headaches.

{¶ 46} J.D. stated that Glover has a drinking problem, and that she only allows him to drink in their bedroom. She stated that he drinks beer and sometimes liquor, and that he "drunk pretty heavy." She stated that Glover drinks from the bottle, and that she

has not observed him drink from a glass.   J.D. stated that she never observed Glover in T.H.'s bedroom "without me being there."   J.D. described Glover as "a honest person" and a "good person."   She stated that if she was unable to help T.H. with her homework, T.H. would ask Glover for help, and that he would help her. J.D. stated that T.H. does not have a relationship with her biological father, but that Glover has driven T.H. to her father's home occasionally to "pick up some money" for T.H.   When shown Exhibit 2, J.D. stated that she had never seen it before, and that T.H. never expressed to her the contents of the exhibit.

{¶ 47} On cross-examination, when asked about her emotional response to the allegations of March 18, 2014, J.D. responded, "I was emotional for both parts, me being in love with [Glover] and my daughter."   She stated that she has been communicating with Glover since his arrest, and that she "sent him a couple of letters not that much and pictures of my daughter and the kids," but not of T.H. She stated that T.H.'s sister slept with her and Glover most of the time and not in the bedroom with T.H., but that on March 18, 2014, the girl was in the bedroom with T.H.

### K.   Willie Blaney

{¶ 48} Willie Blaney testified that he has known Glover for 25 years and that they are both from Mansfield, where they grew up together.   He stated that Glover's father was a pastor and that his mother "dealt with foster kids."   He testified that Glover worked as a guard at the Mansfield Correctional Institute for three or four years.   He stated that in June 2003, he had a conversation with Glover, and that thereafter, Blaney "offered him to come back down here and stay with me," and that Glover did so.   Blaney stated that he lived at the Castlebrook apartment complex in Trotwood at the time.   Blaney stated that

Glover resided with him for the "whole summer about four or five months." Thereafter, Blaney stated that Glover moved in with J.D. at "the end of September or around October."

{¶ 49} Blaney stated that he visited Glover after he moved in with J.D., and that he observed Glover with J.D.'s children. He stated that he never observed any inappropriate conduct from Glover, and that the "kids loved him. They used to call him [Mr. M.]." Specifically, Blaney stated that Glover's relationship with T.H. "was playful. I mean he talked to her like it was his daughter, you know."

{¶ 50} Blaney stated that he and Glover "drunk together," and that they bought "pints so we just drink out of the bottle" with "a beer for a chaser." When asked if Glover ever drank from a glass, Blaney stated that Glover did not "because he bought them little short pints and shorties and stuff, so. There's no need to put that in a glass." He stated that T.H. "was like a normal kid. You know, they ran, played, played in the mud. * * * Played with her brothers." When asked if T.H. ever appeared withdrawn in 2003, Blaney responded, "[n]o. * * * She always was, I mean, the family mix, * * * doing things with the family, laugh and giggle." On cross-examination, Blaney stated that he went to J.D.'s home on Iddings Court almost every day after Glover moved in, but that once the family moved to Kettering, he did not have much contact with them.

## L. J.D.

{¶ 51} Defense counsel recalled J.D., who testified that she and Glover discussed moving from Kettering to Beavercreek or Centerville, and that T.H. wanted to stay in the Kettering area. According to J.D., T.H. "had got mad about the situation that we was moving out of Kettering." She stated that she and Glover were planning to get married.

J.D. stated that she moved into the Iddings Court address in the summer of 2003. She testified that if Glover woke up in the middle of the night, she often got up as well to check on him, and that "[h]e'd be sitting on the computer or he'd be sitting up in the bed smoking a cigarette * * *." She stated that Glover also would watch television when he woke up. She stated that she never observed or heard Glover in T.H.'s bed.

{¶ 52} J.D. testified that she is not afraid of Glover. She identified a "picture of Easter with [Glover] and the kids," outside having an egg hunt. She testified that T.H. is in the photo, "sticking out her tongue," and that she was seven when the picture was taken. J.D. identified a photograph of Glover and T.H. "[b]eing funny. [Glover] got his hands up and [T.H.] putting up the number one." She identified another photo of Glover and T.H., and she testified that T.H. is hugging Glover in the picture and smiling, and that she was seven years old at the time. J.D. stated, "I just went through my picture book last night," and "we had a good life together." J.D. identified a photograph of T.H. at the age of nine and testified that "it's [T.H.] and Marvin holding hands laughing."

{¶ 53} On recross-examination, when asked about Glover's admission to three incidents of sexual abuse, J.D. responded, "[h]e was pressured at the time and that's why he admitted to all them three charges. He didn't do this. I'm telling you. I've been [with] Marvin for 11 years." J.D. testified that Glover has "always been a good person. Every person I met, being around Marvin, * * * good things are said about Marvin, nothing bad."

### M. T.H.2

{¶ 54} T.H.2 testified that T.H. is his sister, and that he is 15 years old. He stated that he has never observed any inappropriate contact between Glover and T.H. He stated that he can hear T.H. in her bed when "she's moving around and stuff." T.H.2

stated that he and T.H. have a close relationship.   He stated that she never told him anything about any sexual abuse perpetrated by Glover, and that if she had done so, he would have told J.D.

### N.   D.D.

{¶ 55} D.D. testified that he is 14 years old and in the eighth grade, and that T.H. is his sister.   D.D. stated that he and T.H. have a good relationship, but that she does not confide in him.   He stated that he has not heard any sounds from T.H.'s bedroom, and that J.D. gives him pills "to help me sleep." D.D. testified that Glover "was my dad," and that "he's a nice guy."   D.D. testified that he never observed Glover engage in inappropriate conduct with T.H., and that T.H. never advised him that Glover did so.

### O.   B.G.

{¶ 56} B.G. testified that she resides on Bromley Place, that J.D. is her fiancé's sister, and that she resides next door to J.D., having lived there for four years. She stated that prior to March 18, 2014, she often went to J.D.'s apartment, and that she spoke to J.D. on the phone several times a day.   B.G. stated that J.D. is involved with her children and would "do special things for them."   She stated that if Glover was not at work, "he would be with them going on their outings, for special occasions and stuff also."   She stated that Glover acted appropriately around the children in her presence.   According to B.G., T.H. and Glover "acted like a normal loving father/daughter kind of way.   She talked to him * * * like it was her dad.   Like there was nothing wrong."

### P.   Marvin Glover

{¶ 57} Glover testified that he is 43 years old, and that he was born in Mansfield. He stated that his father was a pastor, and that his mother "started off working as a janitor

at school and then later on * * * she started keeping foster care."  Glover stated that he completed high school and two years at Central State University, and that he has worked since he was 16 years old. After college, Glover stated that he returned to Mansfield and became a corrections officer.  He stated that after four years he resigned after his mother passed away, moved to Toledo for a short time, and then returned to Mansfield.  Glover stated that he developed a drinking problem and a drug problem after his mother passed away, and that he moved to Dayton "to get away from it."

{¶ 58} Glover acknowledged that he moved into Blaney's home at the Castlebrook Apartments because he himself "was heading for destruction" due to his drinking in Mansfield.  Glover stated that he met J.D. while at Blaney's, and that he initially thought she resided at the Castlebrook Apartments as well, but then he later learned that she was visiting a friend there every day, and that she in fact had her own home.  He stated that one day in August 2003 J.D. did his laundry for him at her home and put it away there. Glover stated he initially took some of his clothes back to Blaney's apartment, but that "as time went on, I end up moving in with her and that was probably * * * about the end of September, beginning of October" of 2003.

{¶ 59}  Glover denied having sex with J.D. in the presence of the children because "it's not appropriate to do that in front of children."  Glover stated that in October 2003 he "got a job at McDonald's downtown," and that he "would catch the bus and I would work, like, until sometimes close.  I'd catch the last bus * * * and get home probably about 1 o'clock."  When he arrived home, Glover stated that J.D. "would be up, she would come up, sit up and talk to me for a while and then we would just go to bed."

{¶ 60} Glover stated that he subsequently got a job as a machine operator at

Select Tool & Die, and that he worked third shift. Glover stated that he worked twelve hour shifts for three or four months, and that he then "went to school for nurse aid" at the Miami Valley Career Center. Glover stated that he worked for Comprehensive Home Health Care "for about two years and then the company went under."

{¶ 61} Glover testified that in September 2013, he began working in Franklin, Ohio, at the Burrows Paper Company, where he worked "60-hour weeks." Glover stated that he lost that job in the first week of March 2014. When asked how he lost his job, Glover stated that he was cited for a misdemeanor offense after he purchased a bag of marijuana at the downtown bus hub. He stated that when he lost his job he "was hurt about it, so I started back drinking heavy." He stated that he advised J.D. that he wanted to move to Columbus to get a better job, and that she said if he did so she wanted to go with him. Glover stated that he knew that T.H. "didn't want to go to another school, so I wasn't going to do that to her * * *." Glover stated that in December 2013, he went to work at 3:00 p.m. and did not get home until between 4:00 and 4:30 a.m.

{¶ 62} Glover stated that when T.H. was seven to eight years old, she was "just a typical child" and "playful." Glover identified the photographs identified by J.D. in the course of her testimony. Glover stated that he drinks beer from a bottle, and that J.D. does not have glasses at her home but only plastic cups.

{¶ 63} Glover acknowledged that he initially repeatedly denied abusing T.H. in his interview with Schomburg. When asked why he did so, he replied, "Because I was afraid. I was afraid because I didn't believe that she called the police on me because [T.H.] wanted it. I mean I was the adult. I was wrong. When I went in that room that morning * * * [T.H.] kicked her leg open, showed me her vagina. I was wrong. I

admitted it. * * *."   Glover stated that he finally admitted that he "gave her oral sex" after the detective told him that T.H. wanted to kill herself.   According to Glover, the Detective "kept asking.   He kept asking me.   Did I do it any other time and I told him no.   And then I started crying.   And then I told him it happened, I told him it happened three times."   Glover acknowledged that he initially indicated that it happened two or three times but then admitted that it happened a total of three times.   He stated that T.H. "has been coming on to me * * * dozens of times," and that he told J.D. about it.   According to Glover, T.H. "was flashing herself to me.   I mean I got weak.   It's just like Adam and Eve. I ate the apple.   I messed up, that's why I came clean."   Glover, however, denied committing the offenses for which he stood trial during his testimony.

## II. Assignments of Error

### A.   First Assignment of Error

{¶ 64}   Glover asserts three assignments of error herein. His first assigned error is as follows:

THE TRIAL COURT ERRED IN PERMITTING IRRELEVANT, HEARSAY AND PREJUDICIAL "OTHER ACTS" TESTIMONY THEREBY DENYING APPELLANT HIS RIGHT TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 65} Glover asserts that "it was prejudicial error for the court to admit the 911 call; the SANE nurse['s] testimony concerning the details of the March 18, 2014 incident; the DNA evidence from the crime lab; T.H.'s testimony and all evidence of other, unindicted

acts of the alleged abuse of T.H. by appellant; and the detailed testimony of T.H. as it pertained to the incident from March 18, 2014."   Glover "further argues that the testimony of S.K. about what T.H. told her and sent her as Exhibit 2; and T.H.'s use of the written statement and its admission into evidence were inadmissible hearsay."

{¶ 66}  As this Court has previously noted:

> Absent an error of law, the admission or exclusion of evidence is a matter committed to the discretion of the trial court, and its decision regarding the admission and exclusion of evidence will not be reversed absent a demonstration of an abuse of that discretion. *State v. Bell*, 176 Ohio App.3d 378, 2008–Ohio–2578, 891 N.E.2d 1280, ¶ 40 (2d Dist.). An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

*State v. Ashe*, 2d Dist. Montgomery No. 26528, 2016-Ohio-136, ¶ 24.

{¶ 67} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." " 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."   Evid.R. 801(C).

{¶ 68} We note that we are mindful of the "usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary."   *State v. White,* 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968).

## 1.  911 Call

{¶ 69}  Glover specifically asserts that while the "statements in the 911 call pertaining to the events of March 18, 2014 were excited utterances, they were nonetheless irrelevant to the charges being tried," and that the portion of the call wherein T.H. claimed that the abuse happened from the time she was seven is hearsay not within the excited utterance exception.  According to Glover, the "crime of gross sexual imposition with 17 year old T.H. does not make the existence of any fact of consequence to the determination of the rape charges from a decade earlier, more or less probable. [Its] purpose was to both prove appellant acted in conformity therewith; and to bolster the credibility of T.H."

{¶ 70}  The State responds that "T.H.'s statement that Glover's abuse started when she was seven was admissible as an excited utterance," and that the "court did not commit plain error by not excluding it on hearsay grounds."  Regarding the portion of the call relating to the events of March 18, 2014, the State asserts that "evidence of other crimes, wrongs, or acts may be admissible to show the background of the alleged crimes at issue," pursuant to Evid.R. 404(B).  According to the State, "T.H.'s statements on the 911 call as to the events of March 18, 2014, were important and relevant to demonstrate how the allegations against Glover first came to light, how the investigation began, why T.H. ended up in the hospital that morning, and how Glover came to be interviewed the next day."  The State asserts that "excluding all evidence as to what Glover had done to the girl that morning would have deprived the fact-finder of the context of the crime, leaving only the testimony of the girl that he had molested her twice on Iddings Court, eleven years before trial, and once on Bromley Place, in December, 2013."

{¶ 71}  As set forth above, defense counsel objected to the admission of the 911 recording based upon its alleged lack of relevance to the charges before the court. Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   Regarding Evid.R. 404(B), "a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created *material* prejudice. * * *. 'Prejudice occurs if there is a reasonable possibility that the error might have contributed to the conviction.' * * *."   *State v.* Miller, 2d Dist. Montgomery No. 26371, 2015-Ohio-2714, ¶ 12.

{¶ 72} The portion of the recording pertaining to the events of March 18, 2014, as the State asserts, is relevant to provide context for the factfinder in understanding how and why the investigation into Glover's criminal conduct commenced. In other words, the evidence is admissible pursuant to Evid.R. 404(B), and we have no basis to conclude that Glover was materially prejudiced by its admission. Accordingly, we find no abuse of discretion in the admission of that portion of the call.

{¶ 73}  We note that defense counsel did not object on the basis of hearsay to the portion of the 911 call wherein T.H. claimed that she had been abused by Glover from the age of seven.   As this Court has noted:

> Failure to object waives all but plain error. *McBride v. Quebe*, Montgomery App. No. 21310, 2006-Ohio-5128.  Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, Clark App. No. 2005–CA–10,

2006-Ohio-5399. "[T]o successfully prevail under plain error the substantial rights of the accused must be so adversely affected that the error undermines the 'fairness of the guilt determining process.' " *State v. Ohl* (Nov. 27, 1991), Ashland App. No. CA–976, 1991 WL 274508.

*State v. Bahns*, 185 Ohio App. 3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.).

{¶ 74} We have no basis to conclude that the outcome of the trial would have been different if the court did not admit the portion of the 911 call wherein T.H. indicated that Glover had abused her since she was seven years old. T.H. testified as to the ongoing nature of the abuse over 11 years and Glover's consistent pattern in abusing her. Further, as discussed below in our analysis of the second assignment of error, we conclude that the statement falls within the excited utterance exception to the hearsay rule, as the State asserts.

### 2. Dallaire's Testimony

{¶ 75} Citing Dallaire's testimony that Glover's DNA was found on T.H.'s right breast and in her underwear, and Ping's testimony about T.H.'s statements to her regarding the offense of March 18, 2014, Glover asserts that such evidence "was to have the effect of showing that since T.H. told the truth about the incident of March 18, 2014, she should be believed about the rapes from 2002-2004." According to Glover, "[t]his evidence, in addition to being irrelevant to the offenses being tried, was an improper support of T.H.'s credibility pursuant to Evid.R. 608. Specific instances of the conduct of a witness, for the purpose of supporting the witness's character for truthfulness, may not be proved by extrinsic evidence." According to Glover, the State "argued that the objected to evidence was necessary to bolster [T.H.'s] credibility regarding her testimony of what she

claimed occurred in 2002 to 2004."

{¶ 76} The State responds that "[w]hat [T.H.] told Ms. Ping about the prior abuse was admissible under Evid.R. 803(4); what she said about the crime that just occurred made sense of it." The State asserts that defense counsel attacked T.H.'s credibility and suggested two motives for T.H. to make false allegations against Glover: "first, that her mother and Glover were thinking of moving the family to Beavercreek and she did not want to leave her friends in Kettering; and second, that she was angry because her mother had taken Glover's side against her for whatever involvement she may have had in facilitating her friend [S * * * * y's] all-night outing." According to the State, "T.H.'s consistent statements to Ms. Ping on March 18, 2014, about the prior abuse were relevant and admissible not only to show the immediate background of the three remaining counts, but also as a prior consistent statement under Evid.R. 801(D)(1) to rebut the suggestion that her trial testimony about the prior abuse was the result of improper motive or influence."

{¶ 77} Evid.R. 608(B) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness * * * may not be proved by extrinsic evidence. * * *."

{¶ 78} Evid.R. 801(D) provides that "[a] statement is not hearsay if: (1) * * * The declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is * * *  (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive."

{¶ 79} Evid.R. 803(4) provides that "[s]tatements made for purposes of medical

diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded from the hearsay rule.

{¶ 80} We agree with the State that T.H.'s credibility was the central issue herein. We note that the State does not address Glover's argument that Dallaire's testimony regarding the presence of Glover's DNA on T.H.'s right breast and her underwear was improperly admitted. We conclude, as the trial court noted, that Dallaire's testimony was relevant and probative of T.H.'s credibility; the evidence tended to corroborate what T.H. stated happened to her on March 18, 2014, and we presume that the trial court considered it for a proper purpose and not as evidence of T.H.'s truthfulness regarding the offenses before the court.

### 3. Ping's testimony

{¶ 81} Glover objected to Ping's testimony on the basis of relevance to the offenses before the court and not on the basis of hearsay, and he does not argue herein that Ping's testimony constituted inadmissible hearsay, so we need not address the State's argument that Ping's testimony was admissible pursuant to Evid.R. 801(D) to rebut an implication of improper influence or motive, or pursuant to Evid.R. 803(4) for purposes of medical treatment. As with the 911 call, T.H.'s statements to Ping were relevant to demonstrate the initiation and context of the investigation into Glover's conduct, as well as to provide context for the course of Ping's examination of T.H.

{¶ 82} We review Glover's argument that the admission of Ping's testimony violates Evid.R. 608(B) pursuant to plain error analysis, since Glover did not so object at trial. We cannot conclude that the admission of the testimony at issue affected Glover's

substantial rights so adversely that the fairness of the guilt determining process is undermined. The court correctly found that the events of March 18, 2014 were relevant and admissible, and we presume that the trial court did not improperly consider the evidence in any fashion.   We note that Glover mischaracterizes the record by suggesting that the State "argued that the objected to evidence was necessary to bolster [T.H.'s] credibility regarding her testimony of what she claimed occurred in 2002 to 2004." However, Glover directs our attention to his objection to the admission of the 911 call, and the State's response thereto, as opposed to any specific objection to Ping's testimony. Finally, we note that the court further found Ping's testimony admissible to establish the chain of custody of the sexual assault kit, which defense counsel had challenged during Dallaire's testimony.

### 4.   March 18, 2014 Evidence and Evidence of Uncharged Crimes

{¶ 83} Glover next asserts that T.H.'s testimony regarding the events of March 18, 2014 and of other uncharged crimes was inadmissible. According to Glover, "T.H.'s testimony that the abuse was ongoing for eleven years was improper pursuant to Evid.R. 404(B); and the probative value was substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A)." He asserts that the "evidence was an attack on appellant's character and the state may not offer evidence in its case-in-chief of the accused's character to show a general propensity to commit the acts underlying the crimes being tried."   Glover asserts that T.H.'s testimony about the events of March 18, 2014 and "uncharged incidents of abuse were aimed at appellant's character and to show he acted in conformity therewith regarding the rapes of 2002-2004."

{¶ 84} The State responds that the "references to the uncharged assaults were

-45-

brief and few, and some were elicited by defense counsel on cross-examination." The State argues that Glover's pattern of abuse was "the same in almost every detail so that the two occasions that varied slightly from the script, Counts 2 and 4, were memorable to her." Citing Miceli's testimony, the State asserts that T.H.'s testimony regarding the 11 years of abuse "was relevant and admissible to explain why she did not disclose the abuse to her mother or any other adult." The State asserts as follows:

> The prosecutor never attempted to exploit T.H.'s brief references to the fact that the abuse was continuing, and it was evident from the context of the entire trial that the references to uncharged conduct were neither introduced nor used to suggest that Glover had a propensity to commit such crimes or to unfairly attack his character, and there is no suggestion that the court used the evidence improperly in finding Glover guilty. * * *

{¶ 85} Evid.R. 404(A) provides in part that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion * * *." Evid R.404(B) is set forth above. The record reflects that the trial court allowed T.H. to testify regarding the events of March 18, 2014 and the prior abuse over the years as proof of Glover's pattern or plan of abuse, namely that he consistently performed oral sex on T.H. in her bed in the early morning hours. We note that in Glover's Notice of Alibi, he suggested that he lacked opportunity to abuse T.H. due to his work schedule, and T.H.'s testimony that he targeted her in the early morning hours repetitively demonstrates plan and opportunity. We further agree with the State's assertion that the references to the uncharged conduct were brief and cursory; the majority of the testimony was addressed to the indicted charges. Additionally, as the

State asserts, the offenses in counts 2 and 4 were memorable to T.H. because the abuse was distinct from the usual pattern; count 2 alleged that Glover first carried T.H. downstairs before abusing her, and count 4 alleged that he digitally penetrated her for the first time. We cannot conclude that the trial court abused its discretion in admitting T.H.'s testimony regarding the events of March 18, 2014 and the other unindicted offenses, and we presume that the trial court properly considered the evidence.

### 5. S.K.'s Testimony and Exhibit 2

{¶ 86} Finally, Glover asserts that "S.K. was permitted to testify that T.H. told her about the abuse and identified appellant as the abuser. * * * T.H.'s statements to S.K. were hearsay." He further asserts that Exhibit 2 "was an out of court statement offered to prove the truth of the matter asserted, ie., the first alleged rape from 2002-2004." Glover asserts that both S.K. and T.H. testified about Exhibit 2, and that "this was inadmissible hearsay and did not fall under Evid.R. 801(D)(1)(b) as T.H. had not been cross examined and there was no express or implied charge of recent fabrication." According to Glover, "T.H. could have testified she wrote the letter and why, but permitting her to testify from the letter and admitting it into evidence was improper." He asserts that "S.K.'s entire testimony about the letter was inadmissible hearsay." Glover asserts that "S.K. testified that she had no personal knowledge of any of the events and her testimony was solely from what T.H. had told her in out of court statements." He asserts that "S.K.'s testimony was clearly admitted to bolster T.H.'s credibility and constituted inadmissible hearsay."

{¶ 87} The State responds that the "evidence came in without objection, so it is subject to plain error analysis." The State further asserts that "S.K.'s testimony and the letter were prior consistent statements offered to rebut an express or implied charge of

recent fabrication, or improper motivation or influence. Evid.R. 801(D)(1)(b)." The State asserts that "admission of the evidence was not error at all, much less plain error." We note that the State did not address Glover's argument that T.H.'s testimony about Exhibit 2 is hearsay.

{¶ 88} Glover directs our attention to T.H.'s direct examination in which she indicated that she wrote the letter contained in Exhibit 2 to her mom and dad but did not deliver it to them because she did not want to make J.D. "mad." She testified that in the letter she indicated that the abuse began when she was six, that it made her feel confused and depressed, and that she cut herself and took "a bunch of pills" when she was 17 as a result of the abuse. T.H. testified that she indicated in the letter that she felt that she could not come forward about the abuse because Glover is "my sister's dad and my mom loved him and everyone thought he was a good person." On redirect examination, she acknowledged that she recounted the specifics of the first incident of abuse in the letter.

{¶ 89} S.K. testified that T.H. disclosed abuse to her and that she did not learn that Glover was the abuser or that the abuse was ongoing until the summer before her junior year. She identified Exhibit 2 and stated that T.H. sent it to her on Facebook on October 24, 2013, and that T.H. therein disclosed specifics of the abuse and her feelings about it.

{¶ 90} Even if we were to conclude that T.H.'s testimony on direct about the contents of Exhibit 2 amounts to inadmissible hearsay, plain error is not demonstrated. On cross-examination, defense counsel extensively questioned T.H. about Exhibit 2, quoting therefrom verbatim. Accordingly, we have no basis to conclude that T.H.'s testimony as cited by Glover undermined the fairness of the guilt determining process.

As to S.K.'s testimony, by the time she testified, defense counsel had recited the contents of Exhibit 2 into the record, and we cannot conclude that the outcome of the proceeding would have been different in the absence of S.K.'s testimony.

{¶ 91} For the foregoing reasons, in the absence of an abuse of discretion or plain error, Glover's first assigned error is overruled.

### B.   Second Assignment of Error

{¶ 92} Glover's second assignment of error is as follows:

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE INTRODUCTION OF HEARSAY EVIDENCE.

{¶ 93} Glover asserts that "trial counsel was deficient for failing to object to the use of Exhibit 2 and its admission into evidence; Detective Schomb[u]rg's repeated testimony that the out of court hearsay statements of T.H. and S.K. were consistent with their trial testimony * * *; T.H.'s out of court hearsay statements as testified to by S.K.; and any of the evidence set forth in the first assignment of error to which counsel did not object." According to Glover, "T.H.'s testimony was improperly bolstered by T.H.'s out of court statements to Detective Schomburg, S.K., the SANE nurse and the crime lab." Glover asserts that he "would not have been convicted if counsel had objected and the inadmissible evidence had been excluded."

{¶ 94} The State responds that it demonstrated that the evidence in the first assignment of error was not hearsay. The State further argues that Schomburg's "testimony that T.H.'s story of what happened had remained consistent from March 18, 2014, onward was *not* an out of court statement offered for the truth of the matter

asserted, so it was not hearsay under Evid.R. 801(C)." According to the State, if "the prosecutor asked the detective to recount from the witness stand what T.H. had told him about the crimes and offered that testimony as proof that Glover was guilty, then counsel could have objected on hearsay grounds. But here, counsel did not ask for a statement at all, only an opinion as to whether T.H.'s accounts of what happened" were consistent.

{¶ 95} As this Court has previously noted:

> To establish a claim for ineffective assistance of counsel, the defendant has the burden of demonstrating that: 1) the performance of defense counsel was seriously flawed and deficient; and 2) there is a reasonable probability that the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *State v. LeGrant*, 2d Dist. Miami No. 2013–CA–44, 2014–Ohio–5803, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness, and that counsel's deficiencies were serious enough to create a reasonable probability that, but for the deficiencies, the result of the trial would have been different.

*State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 7.

{¶ 96} As this Court further noted in *Dover*:

> It is well established that ineffective assistance of counsel affects a substantial right afforded by the United States and Ohio Constitutions.

*Strickland v. Washington, supra*; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.' " *State v. Few*, 2d Dist. Montgomery No. 21561, 2012–Ohio–5407, ¶ 10, quoting *Strickland* at 687. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.* at ¶ 11, quoting *State v. Nabors*, 2d Dist. Montgomery No. 24582, 2012–Ohio–4757, ¶ 17. "Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel." *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Generally, the decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy decisions are not a basis of a finding of ineffective assistance of counsel. *State v. Moss*, 2d Dist. Montgomery No. 22496, 2008–Ohio–6969, ¶ 35, citing *State v. Murphy*, 91 Ohio St.3d 516, 524, 747 N.E.2d 765 (2001); *State v. Dixon*, 101 Ohio St.3d 328, 2004–Ohio–1585, 805 N.E.2d 1042, ¶ 52[.]

When the issue of effective assistance is appealed, reviewing courts are often faced with that task of scrutinizing whether an attorney's conduct was based on sound trial strategy, or was constitutionally defective. In

those cases, we have recognized that:

"Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Carter (*1995), 72 Ohio St.3d 545, 558.

"As a result, trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *State v. Sallie* (1998), 81 Ohio St.3d 673, 675.

*State v. Wheeler*, 2d Dist. Montgomery No. 24427, 2011–Ohio–5565, ¶¶ 14–15.

*Dover*, 2015-Ohio-4785, at ¶ 10-11.

{¶ 97} To the extent that Glover may be arguing that defense counsel was ineffective in failing to object to the hearsay nature of the 911 recording, based upon his assertion in the first assignment of error that the 911 recording contained hearsay, we agree with the State that the recording falls within the excited utterance exception to the hearsay rule. Pursuant to Evid.R. 803(2), an excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." As the Supreme Court of Ohio has indicated, "[t]he

admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." * * * *State v. Leonard*, 104 Ohio St. 3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 95.

{¶ 98} We have listened to the 911 recording, and it reflects that T.H. was extremely emotional in the course of the call, and that she indicated that Glover abused her from the age of seven in response to a question by the dispatcher that was neither coercive nor leading. The focus of T.H.'s thoughts at the time was Glover's abuse of her and her inability to withstand it any longer, and the recording reflects that the subsequent question by the dispatcher as to how long the abuse had been occurring did not destroy the domination of the nervous excitement over her reflective faculties.   The testimony of Sanders and Mason supports this conclusion. Accordingly, we cannot conclude that had counsel objected to the recording on the basis of hearsay, the outcome of the trial would be different.

{¶ 99} As to the admission of Exhibit 2, we note that defense counsel cross-examined T.H. extensively about the exhibit, and we conclude that he intended to do so, rather than objecting to its introduction and admission, as a matter of trial strategy to impugn T.H.'s credibility by means of statements therein that were inconsistent with her testimony, as well as to suggest that someone else helped her write it.

{¶ 100} As to Schomburg's testimony regarding the consistency of T.H.'s version of events over time, and the consistency of S.K.'s version of events with that of T.H., we cannot conclude that the result of Glover's bench trial would have been different if

defense counsel had objected to the detective's testimony. T.H. provided detailed testimony regarding each of the offenses before the court, which she specifically remembered because they were unique. S.K. testified after T.H., and her testimony reflects that T.H. disclosed the abuse to her in a manner consistent with T.H.'s testimony. S.K. identified Exhibit 2 as the message she received from T.H., and as discussed above, defense counsel did not object to the admission of Exhibit 2 as a matter of trial strategy. Accordingly, we conclude that ineffective assistance of counsel is not demonstrated. Glover's second assigned error is overruled.

### C. Third Assignment of Error

{¶ 101} Glover's third assigned error is as follows:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 102} Glover asserts that "T.H.'s testimony of events alleged from ten years earlier was conflicting in several details." He asserts that her testimony was inconsistent as to the frequency of the abuse, how often he left money on her dresser, what she wore at the time of the first incident, and when she began cutting herself. Glover notes that "T.H.'s purported memory of the first alleged incident in 2003 was presented as clearer than her memory of specific details of the alleged incident of gross sexual imposition from December, 2013." Glover further notes that T.H. never told anyone about the ongoing abuse, and that S.K. never told her own parents. Glover asserts that there "was no corroborating evidence of T.H.'s allegations of rape." According to Glover, if "this Court overrules the first and second assignments of error and holds that the complained of evidence was properly admitted, the trial court nonetheless could not use that evidence to

prove that appellant acted in conformity therewith regarding" the offenses before the court.

{¶ 103} The State responds that T.H.'s "inability to accurately remember how often or how regularly Glvoer molested her over the course of 11 years does not mean the judge lost his way in crediting her testimony about the three crimes about which she offered detailed testimony." According to the State, the number of times Glover left money on T.H.'s dresser "is not an element of the crimes with which he was charged," and that whether she wore a nightdress or pajamas the first time she was abused is "inconsequential, especially when compared to the details she did recall." The State asserts that the court "was not required to disbelieve" T.H. about the cutting and suicide attempt "simply because she never told her mom and the scars eventually faded." The State asserts that T.H.'s "testimony was not incredible simply because she did not disclose the abuse to an adult until she called 911 in March of 2014." The State asserts that the fact that her mother never noticed her depression and cutting behavior is not evidence that T.H. is not credible. Finally, the State asserts that there is "no reason to believe that the judge who found Glover guilty did so by using [Evid.R. 404(B)] evidence as proof of his propensity to commit the crimes."

{¶ 104} As this Court has previously noted:

When analyzing a challenge to the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered. *State v. McKnight*, 107 Ohio St.3d 101,112, 2005–Ohio–6046, 837 N.E.2d 315. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N .E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

*State v. Henderson*, 2d Dist. Montgomery No. 26018, 2014-Ohio-4601, ¶ 23-24.

{¶ 105} Glover was convicted of two violations of R.C. 2907.02, which provides: "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies: * * * (b)   The other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Glover was convicted of one violation of R.C. 2907.03, which proscribes sexual battery and provides: "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * (5) The offender is the other person's natural or adoptive

parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.01(A) defines "sexual conduct" in part as "cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another."

{¶ 106} Having reviewed the entire record, we cannot conclude that Glover's convictions are against the manifest weight of the evidence due to the inconsistencies in T.H.'s testimony and her delay in disclosing the abuse. Miceli testified, as an expert in the dynamics of childhood sexual abuse, that inconsistencies are common in delayed disclosure cases involving multiple instances of abuse, because "it can be difficult to remember specifics of any one event" unless "there's something unique about that event."   While T.H. may not have remembered all of the specific details of the offenses before the court, her testimony was clear that in the course of the first instance of abuse on Iddings Court, Glover entered her room in boxer shorts, put his drink on her dresser, performed oral sex on her in her bed, smelled of alcohol, and told her that the abuse was their little secret. Similarly, T.H.'s testimony was clear as to the subsequent offenses where Glover deviated from his usual pattern of performing oral sex on T.H. in her bed by carrying her downstairs before abusing her in the living room on Iddings Court, and subsequently by digitally penetrating her on Bromley Place, causing a sharp pain that prompted T.H. to push him off, resulting in Glover's apology and promise not to do it again.   The factfinder credited T.H.'s testimony, and we defer to the court's assessment of credibility.

{¶ 107} Further, we note Miceli's testimony that it is common for child victims not to disclose sexual abuse until adulthood. Miceli stated that many young children are not

aware that anything inappropriate has happened to them when the abuser is someone they trust, and we note that T.H. testified that in the course of the first instance of abuse, she did not know what to do. Miceli testified that "once an abuse has happened one time and the child hasn't told, they are less likely to tell as time passes." Miceli testified that children also commonly disclose abuse in a vague and incremental fashion to someone they trust, and the record reflects that T.H. did so with S.K. Miceli testified that some children "compartmentalize" the abuse and continue contact with their abuser, and T.H. testified that she did not want to tear her family apart, so she "just acted like it wasn't happening until I got older." Miceli stated that it is difficult for children to disclose abuse because they worry that they will not be believed or get into trouble, and T.H. testified that she did not disclose the abuse because she feared angering her mother. S.K. testified that T.H. feared that her family would be torn apart if she disclosed the abuse.

{¶ 108} While Glover suggests that J.D.'s failure to notice T.H.'s depressive symptoms impugns T.H.'s credibility, J.D. suffers from a mental illness, and Miceli testified that child victims of sexual abuse often exhibit internalizing behaviors "that are turned more inward so there tends to be anxiety, nightmares, suicidal ideation, depressive symptoms, cutting," and that those around victims with internalizing behaviors often "are not aware of that." T.H. testified that she cut herself and attempted suicide, and that she did not confide in J.D. or seek medical treatment.

{¶ 109} Finally, as noted above, Glover was tried to the bench, and we presume that the trial court considered only the relevant, material, and competent evidence in arriving at its judgment, and we conclude that the record does not affirmatively reflect, as Glover asserts, that the court improperly considered evidence of other crimes, wrongs or

acts to prove Glover's character in order to show action in conformity therewith, in violation of Evid.R. 404(B).

{¶ 110} Having thoroughly reviewed the entire record, weighed the evidence and all reasonable inferences, and deferring to the trial court's assessment of credibility, we conclude that a manifest injustice is not demonstrated, and that Glover's convictions are not against the manifest weight of the evidence. Glover's third assignment of error is overruled.

{¶ 111} The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Carley J. Ingram
James S. Armstrong
Hon. Barbara P. Gorman